**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARIE K. WONSCH,

         CASE NO. 2:17-cv-13863

   *Plaintiff*,     DISTRICT JUDGE STEPHEN J. MURPHY

         MAGISTRATE JUDGE PATRICIA T. MORRIS

*v*.

COMMISSIONER OF SOCIAL SECURITY,

   *Defendant*.

_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (R. 11 & 13)**

**I. RECOMMENDATION**

   In light of the entire record in this case, I suggest that substantial evidence supports

the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS**

**RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 11), be **DENIED**,

the Commissioner's Motion for Summary Judgment, (R. 13), be **GRANTED**, and this case

be **AFFIRMED**.

**II. REPORT**

   **A.  Introduction and Procedural History**

   This is an action for judicial review of a final decision by the Commissioner of

Social Security denying Plaintiff Marie K. Wonsch's claim for Disability Insurance

Benefits (DIB) under Title II, 42 U.S.C. § 401 *et seq.* (R. 1). Pursuant to 28 U.S.C. §

636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred

to the undersigned Magistrate Judge. (R. 3). Currently before the Court are Plaintiff's and Defendant's cross-motions for summary judgment (R. 11, 13).

Plaintiff filed the application for DIB at issue here on August 14, 2014, alleging onset on January 15, 2012. (R. 7 at Page ID # 46). Prior to her hearing, she amended her onset date to August 7, 2013. (*Id.* at Page ID # 74). Her claim was denied at the initial level on June 22, 2015. (*Id.*). After an administrative hearing was held at Plaintiff's request, (*id.*), Administrative Law Judge (ALJ) B. Lloyd Blair issued a decision finding that Plaintiff had not been under a disability from her amended alleged onset date of August 7, 2013, through the date last insured, June 30, 2016. (Page ID # 46-62). The Appeals Council denied Plaintiff's request for review. (Page ID # 29-34). This action followed. (R. 1).

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker*

2

*v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not

"try the case de novo, nor resolve conflicts in the evidence, nor decide questions of

credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion." *Id*.

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'"

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than
> [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If
> you are doing substantial gainful activity, we will find that you
> are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically
> determinable physical or mental impairment that meets the
> duration requirement . . . or a combination of impairments that
> is severe and meets the duration requirement, we will find that
> you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of
> your impairment(s). If you have an impairment(s) that meets

or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered him or her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff had not been under a disability from the amended alleged onset date of August 7, 2013, through the date last insured, June 30, 2016. (R. 7 at Page ID # 46-62). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period. (*Id.* at Page ID # 48). Next, the ALJ determined Plaintiff had the following severe impairments: cervical spine degenerative disc disease, status–post C4-C7 fusion; lumbar spine degenerative disc disease with radiculopathy, status–post L5-S1 fusion; chronic obstructive pulmonary disease (COPD)/asthma; chronic venous insufficiency; carotid artery stenosis; cardiomyopathy; congestive heart failure; aortic valve stenosis; mitral valve insufficiency; headaches; gastroesophageal reflux disease (GERD); hypertension; obesity; major depressive disorder; polysubstance abuse with a history of respiratory failure, myocardial infarctions, and stroke; and tobacco dependency. (*Id.*). Additionally, she had as non-severe impairments left shoulder tendinosis; chronic kidney disease; and a history of carpal tunnel syndrome with release surgery. (*Id.* at Page ID # 49). She did not, however, have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (*Id.*). Before proceeding further, the ALJ found Plaintiff had the RFC to perform light work as defined in 20 C.F.R 404.1567(b), except that she

> can never use ladders, scaffolds, or ropes; occasionally use ramps, stairs, stoop, kneel, crouch, or crawl; avoid concentrated exposure to fumes, odors, gases, and respiratory irritants; never use pneumatic, torque or machinery or work at unprotected heights; occasionally bend, twist, and turn at the waist or the neck; can do no commercial driving; can never use foot controls; and requires simple unskilled work with one, two, or three step instructions.

(*Id.* at Page ID # 52). At steps four and five, the ALJ concluded Plaintiff was unable to perform any of her relevant past work, but that jobs that she could perform existed in significant numbers in the national economy—for example, a bench assembler (450,000 jobs nationally) and an inspector (600,000 jobs nationally). (*Id.* at Page ID # 61-62). Thus, the ALJ determined that Plaintiff had not been under a disability as defined in the Social Security Act during the relevant time period. (*Id.* at Page ID # 62).

### E. Administrative Record

#### 1. Medical Evidence

The Court has reviewed Plaintiff's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2. Application Reports and Administrative Hearing

##### i. Plaintiff's Function Report

Two function reports from Plaintiff appear in the record—one completed on October 8, 2014, (R. 7 at Page ID # 221-233), which is accompanied by an asthma form (*Id.* at Page ID # 234-237), and one completed May 14, 2015, (*Id.* at Page ID # 238-250). I will summarize each in turn.

In her October 2014 function report, Plaintiff stated she was living with her husband in a house. (*Id.* at Page ID # 227). A stroke had left her with "short memory loss," trouble concentrating, and "some stumbling and shakiness," as well as lingering migraines with sensitivity to light and sound. (*Id.* at Page ID # 227, 233). She often forgot appointments she had made and to take her daily medication; although she put her medicine in containers

6

labeled by the day, she sometimes forgot to take them out of her nightstand. (*Id.* at Page ID # 228).

Plaintiff stated she suffered from spina bifida, scoliosis, and spondylolisthesis, a broken back, and sciatica in her leg, which hurt when she stood or walked too far. (*Id.* at Page ID # 227). After sitting for a couple of hours, she needed to lie down. (*Id.*). She had fallen three times in the past year "when the pain was too much." (*Id.*). Recently, she had enlisted the help of a cleaning service because she could not keep up on household chores without hurting herself; her husband was building laundry facilities on the main floor because she could no longer carry laundry up stairs. (*Id.*).

On an average day, she took a bath, made coffee, did the dishes, folded laundry, fed the dogs, shopped for groceries or ran other errands, and attended medical appointments. (*Id.* at Page ID # 227). Otherwise, she could frequently be found lying in bed and watching television. (*Id.*). She also took care of her two dogs—feeding them, giving them treats, and letting them in and out. (*Id.*). Her husband helped "when he [was] not in Toronto." (*Id.*).

Before onset, she had been better able to lift, do the laundry, change the bedding, and walk, stand, and sit for long periods. (*Id.*). Plaintiff's sleep was also troubled, as she had struggled to "get[] comfortable and out of pain." (*Id.*). If she lay on her side, her neck hurt. (*Id.*). If she lay on her back, her back hurt. (*Id.*). Nor could she sleep on her stomach. (*Id.*).

Using a blow dryer and holding her arms in the air also hurt her neck, and sometimes lowering herself to the toilet and returning to standing hurt her back. (*Id.*). Further, trying to change the fitted sheet on her bed hurt her neck and back. (*Id.*). But she was able to

dress, bathe, shave, and feed herself without issue. (*Id.*). Around the house, she was able to fold the laundry so long as her husband carried it upstairs, load and unload the dishwasher, wipe the counters, and dust. (*Id.* at Page ID # 228). She loaded the dishwasher and wiped the counters daily, and did laundry once a week. (*Id.*).

Sandwiches, frozen food, salad, cheese, fruit, and vegetables comprised the foods Plaintiff was able to prepare herself. (*Id.* at Page ID # 228). Her husband usually made a "good hot dinner," and twice a month she spent 20 to 30 minutes making "chicken or shrimp vegtable [sic] pasta" because her husband did not care for vegetables. (*Id.*). When she needed to spend a while using the stove, she would put a chair in front of the stove so she could sit. (*Id.*).

Plaintiff went outside daily, and was able to drive and go out alone. (*Id.* at Page ID # 229). On a regular basis, she went to Kroger, Rite Aid, Walgreens, Bath and Body Works, and Cider Mill. (*Id.* at Page ID # 230). A massage for her sciatica was also part of her weekly routine. (*Id.*). Each week, she shopped in store or by phone for groceries, dog treats, bath salts, bubble bath, and lotions, spending 20 to 30 minutes in the store. (*Id.* at Page ID # 229). She could pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.*).

For fun, Plaintiff enjoyed reading, watching television, doing Sudoku puzzles, and drawing, though she had not drawn "for a while." (*Id.* at Page ID # 230). She was interested in watercolors and oils, and would also like to learn other languages. (*Id.*). The only change in her hobbies since onset was that now, when she read "for too long," her neck would hurt. (*Id.*). She also used to love arts and craft fairs, carnivals, and the like, but was now unable

to enjoy them for unspecified reasons. (*Id.*). Further, she said, "We have a pontoon boat that we use[d] to use a lot but I can walk to and from it." (*Id.*)

Once or twice a month, her friends would come over and watch television and talk. (*Id.*). During the holidays, she and her husband visited her in-laws in Windsor, Ontario. (*Id.*). She had no problems getting along with others, including authority figures. (*Id.* at Page ID # 231-232). Though she might at times feel frustrated or irritable, she did not lose her temper. (*Id.* at Page ID # 232). "I try to handle whatever comes to me the best I can." (*Id.*).

Her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, understand, follow instructions, and use her hands, as well as her memory. (*Id.* at 231). She explained that she could only lift 5 pounds, the stroke had affected her memory, and her back, neck, and leg made most movements painful. (*Id.*). By Plaintiff's estimate, she could walk 15 to 20 minutes before she needed to rest—for at least 10 to 15 minutes, if her asthma or COPD were troubling her, or for at least a couple of hours if her back and leg were to blame. (*Id.*).

Plaintiff did not know how long she could pay attention, but always found herself rewinding what she was watching on television. (*Id.*). When she stood up to get something, she would forget what. (*Id.*). She did not finish what she started. (*Id.*). Written instructions were easier for her to follow than spoken ones. (*Id.*).

Plaintiff wore contact lenses or glasses for reading. (*Id.* at Page ID # 232). She took a variety of medicines, some of which caused side effects: the Percocet caused gas, constipation, and drowsiness, and the Xanax and Baclofen caused sleepiness.

On an "Asthma Form" also completed in October 2018, Plaintiff noted no asthma attacks within the last year requiring inpatient hospitalization, emergency room treatment, or treatment at a doctor's office or urgent care facility. (*Id.* at Page ID # 236). Attacks could be triggered by extreme cold, humidity, climbing too many stairs, walking too fast, or otherwise getting out of breath. (*Id.*). An asthma attack usually lasted 5 to 20 minutes. (*Id.*). To control her asthma, Plaintiff took Advair and Spiriva daily, and Albuterol and ProAir as needed. (*Id.*). Still, Plaintiff "almost always wheez[ed]." (*Id.* at Page ID # 237). During an attack, Plaintiff would "cough really bad" until she could "cool down and rest" for 5 to 20 minutes. (*Id.*).

In her more recent function report, Plaintiff explained at length how her impairments limited her ability to work: due to her asthma and COPD, she had difficulty breathing in air warmer than 69 degrees, in humidity, or in extreme cold. (Page ID # 243). Since her back surgery, her hip and buttock pain had worsened, as had the stiffness in her leg and numbness in lower leg and foot. (*Id.*). She could not stand still for more than 3 to 5 minutes, and could not walk for more than 15 to 20 minutes. (*Id.*). Further, she had to lie down after 30 to 40 minutes of sitting due to neck pain from her C4-C7 fusion. (*Id.*). Since her stroke, she had had trouble with her memory and focus; she was "almost always" 15 to 20 minutes late leaving the house and often forgot appointments. (*Id.*). And she felt her depression was worsening. (*Id.* at Page ID # 244). She did not want to get out of bed, and went three to four days without bathing, when previously she had taken one or two baths a day. (*Id.*). "Things are just seeming overwhelming anymore." (*Id.*).

10

On an average day, she would spend 9 to 10 hours in bed. (*Id.*) Once she got up, she would get something to eat or drink, brush her hair and teeth, and put away a load of laundry or clean a few dishes. (*Id.*). Then she sat with her husband for dinner. (*Id.*). Plaintiff and her husband continued to care for their dogs by each feeding them, letting them outside, and giving them treats. (*Id.*).

Prior to onset, Plaintiff had worked full-time for 28 years, and had been able to do household tasks like cooking dinner every night, the dishes, and the laundry, all while also keeping the house clean and finding time for socializing. (*Id.*). Now she could "barely" sleep at night because her neck, hip, back, and leg pain kept her awake. (*Id.*). She also dwelled on "how much I used to do with my life that I don't do now or feel to[o] mentally exhausted to do." (*Id.*).

Her personal care had also suffered. She stayed in her pajamas unless she was going out, did not bathe as often, and "rarely" dried her hair or wore makeup anymore. (*Id.*). She did brush her hair daily and blow dry her bangs, but trying to dry more hurt her neck and back, and standing hurt her back and hips. (*Id.*). She said she did not need to shave "due to a lack of blood flow." (*Id.*). Plaintiff could feed herself, but her husband cooked and did most of the dishes. (*Id.*). Once a month she cooked "something easy" like spaghetti, cheeseburgers, or steaks, and otherwise ate things she could "grab out of the fridge" like cheese, lunch meat, and fruit. (*Id.* at Page ID # 245). Cooking took her twice as long as it used to; she had to sit rather than stand in front of the stove or counter due to back and hip pain. (*Id.*).

Her husband now had to do the laundry, though twice a week she would fold the clean laundry, and he sometimes asked her to put a "few dishes" in the dishwasher. (*Id.*). In general, she did not do house or yard work "75% of the time because of pain" and "25% of the time because of depression and no motivation." (*Id.* at Page ID # 246).

Plaintiff went outside two to three times a week, occasionally driving, but usually riding in the car with her husband. (*Id.*). Once or twice a week, she went shopping for groceries and dog treats, and picked up medication, which she estimated took 10 to 15 minutes. (*Id.*). She still had some ability to handle money, though her sister now helped her pay bills because keeping track of her bills and taxes had become "overwhelming," at least "partly" due to her lack of focus and concentration in the aftermath of her stroke. (*Id.* at Page ID # 244, 246). Previously, she had been able to handle everything herself. (*Id.* at Page ID # 247). She also now needed to write down when to take her medications and reminders of her appointments. (*Id.* at Page ID # 245).

Her love for arts and crafts had fallen by the wayside, as she was "unable to do those things now." (*Id.*). Instead, she lay in bed watching television "almost all the time," or, when the lake was warm enough, swimming "every week or two." (*Id.*). She met her sisters for lunch once a month and talked to "the couple friends I have left" on the phone every couple weeks; she had "lost most of [her] friends due to lack of activity and socializing." (*Id.*). When she had plans to go places, she canceled about half the time, and "almost always" had to be reminded. (*Id.*). She needed someone to accompany her on outings that were not quick and close to home. (*Id.*). Though she did not have problems

getting along with others, she did not participate "in 90% of what [she] used to." (*Id.* at Page ID # 248).

Lifting, squatting, bending, standing, reaching, walking, sitting, and kneeling were painful, as was stair climbing, which made her out of breath and caused her chest to hurt. (*Id.*). Her stroke and depression, meanwhile, affected her memory, concentration, and understanding, as well as her ability to complete tasks, follow instructions, and use her hands (by causing her to drop or spill things). (*Id.*). When given spoken instructions, she needed to write them down or ask for them to be repeated. (*Id.*).

She could walk 10 minutes before needing to stop and rest for 10 minutes, or she could walk for 15 to 20 minutes if she had a grocery cart for support. (*Id.*). Her attention span lasted up to 10 minutes, but only as much as 2 minutes if "there is other noise." (*Id.*). She did not finish what she started. (*Id.*). Changes in routine challenged her memory. (*Id.* at Page ID # 249). She also noted that she was becoming more afraid of heights. (*Id.*).

Plaintiff had been prescribed a walker after her surgery, but found it hard to use, preferring a grocery cart for support. (*Id.*). The walker seemed to worsen a painful blocked vein in her right arm. (*Id.*). Her hydromorphone prescription also caused side effects of unsteadiness, sleepiness, and constipation. (*Id.* at Page ID # 250).

### ii. Plaintiff's Testimony at the Hearing

An administrative hearing was held in Plaintiff's case on July 27, 2016, before ALJ B. Lloyd Blair. (*Id.* at Page ID # 68-91). Plaintiff was 52 years old at the time of the hearing. (*Id.* at Page ID # 72). She had completed schooling through grade twelve. (*Id.* at Page ID # 73). She could drive. (*Id.*).

13

Though she had worked at Big Boy headquarters for eighteen years, and had also worked at Home Depot and Lord and Taylor, her only job in the last 15 years had been management of a Big Boy restaurant. (*Id.* at Page ID # 73-74). There, she would bus tables, seat patrons, take payment, run food, and do office work. (*Id.* at Page ID # 74). She had not worked or volunteered since her amended alleged onset date of August 7, 2013. (*Id.*). A variety of medical conditions kept her from working, she explained: neck pain, lower back pain, tendonitis in both hips, neuropathy and pain in her legs (mostly her left), headaches, asthma, and COPD. (*Id.* at Page ID # 74-75). She had also had a minor stroke and minor heart attack. (*Id.* at Page ID # 75).

Her neck problems had begun seven or eight years ago; she had had surgery in March 2015 to fuse C4 through C7. (*Id.* Page ID # 75-76). Post-surgery, she had received epidurals. (*Id.*). With hydromorphone and pain cream, she rated her neck pain at a five. (*Id.* at Page ID # 76). The medication had a side effect of sleepiness and possibly also caused her to feel hot. (*Id.*). She also took a muscle relaxant, Baclofen, and Advil for her neck. (*Id.*).

Her back issues had been present from birth, though she had first noticed them when she was hurt playing volleyball at age 16, and they "mostly got bad" in the past seven years. (*Id.* at Page ID # 76-77). She had had back surgery in November 2015. (*Id.* at Page ID # 77). She rated her low back pain at a six. (*Id.*). The leg pain had begun before the surgery, when she "would drag her leg"—her husband had described her as "walking like a mummy." (*Id.*). After her surgery, "part of the bad leg pain went away," but she "gained the pain in [her] foot and all of the numbness." (*Id.*).

14

Her hip problems had surfaced in the past couple of years. (*Id.*). The only treatment available was cortisone injections, which were "not helping much," but hip replacement surgery would not be an option for 10 or 15 years yet because she was too young. (*Id.*).

Further, her whole life she had endured headaches, some "cluster migraines" and others stemming from her TMJ. (*Id.* at Page ID # 77-78). About four days a week, she suffered from migraines, which lasted "[s]ometimes a few hours, sometimes [a] couple days." (*Id.* at Page ID # 78). For her headaches, she took Tramadol. (*Id.*).

Her asthma and COPD, meanwhile, had been diagnosed about 10 years ago. (*Id.*). To treat her breathing problems, Plaintiff took Advair and Spiriva, and used ProAir as an emergency inhaler. (*Id.*). She had also been prescribed a nebulizer about 10 years ago, and was supposed to use it four times a day. (*Id.*). Her breathing issues had landed her in the hospital on more than one occasion—she "[had gone] into cardiac arrest a couple of times," when pneumonia had triggered her asthma. (*Id.* at Page ID # 79). Most recently, she had been hospitalized about seven to eight months earlier, though she had not had pneumonia at that time. (*Id.*). Rather, she had been hospitalized for a seizure after using cocaine. (*Id.* at Page ID # 80-81). She used to use it two to three times a year, but after her hospitalization, she said, she would "never touch it again." (*Id.* at Page ID # 84, 81).

Additionally, Plaintiff mentioned "pre-cancerous cells" in her breast and an upcoming lumpectomy. (*Id.* at Page ID # 85-86).

For the past three or four years, Plaintiff had also treated with a psychiatrist, Dr. Brazzle, whom she saw every three weeks. (*Id.* at Page ID # 79). Before that, about twenty years previously, she had seen a psychiatrist for marital issues. (*Id.*). Dr. Brazzle had

15

prescribed Restoril and Seroquel to help her sleep, which caused weight gain and made her "jittery"—"kind of involuntary muscle movements." (*Id.* at Page ID # 80).

She "[a]lmost never" drank alcohol—maybe two to four beers a month. (*Id.* at Page ID # 82). She had gone to Narcotics Anonymous 10 years ago, but was not currently a member of Narcotics Anonymous or Alcoholics Anonymous. (*Id.*). She was a smoker, although Chantix had helped her cut down to smoking three-quarters of a pack a day, "about half of what I normally smoked." (*Id.*).

Currently, she lived with her husband of 21 years in a house. (*Id.* at Page ID # 82). She did not cook or do yard work and "barely" did laundry. (*Id.*). She shopped for "a few groceries," though her husband did "the big shoppings." (*Id.*). "Once in a great while" she went to her sister's house to visit, and her neighbors sometimes came over to visit. (*Id.* at Page ID # 83). Although Plaintiff went to bed at 8 or 9 PM, she would be "up most of the night on and off," and get up around 8 AM. (*Id.*). A typical day was spent "sitting cross-legged on the bed," watching television. (*Id.*). If it was not too humid outside, she might sit with the dogs on the deck for half an hour. (*Id.*).

She did "not do well" going up stairs or inclines, but could bend over to pick up an item off the ground, and could squat. (*Id.*). She estimated she could lift 10 pounds, stand for 10 minutes, sit for 60 to 90 minutes, and walk half a block. (*Id.*).

### iii.    The Vocational Expert's Testimony at the Hearing

Vocational Expert (VE) Erin O'Callaghan also testified at the hearing. (*Id.* at Page ID # 87). She began by classifying Plaintiff's past work as a restaurant manager (light, skilled work). (*Id.*). Then the ALJ posed the first hypothetical:

> [A]ssume my hypothetical individual can meet the demands of light work; should not use ladders, scaffolds, or ropes; only occasional use of ramps[,] stairs, stoop, kneel, crouch, or crawl. Should never use pneumatic or power tools. Should avoid concentrated exposure to hazards including dangerous and unprotected machinery[ and] work at unprotected heights. Only occasional[ly] bend, twist or turn at waist or neck. Do no commercial driving, and never use foot controls.

(*Id.* at Page ID # 87-88). The VE testified that such a person could do Plaintiff's past work. (*Id.* at Page ID # 88).

An additional limitation of only simple unskilled work with one, two, or three-step instructions, however, eliminated Plaintiff's past work. (*Id.*).   Instead, such a person could perform light unskilled jobs like a bench assembler (6,000 jobs in southeast Michigan, 450,000 nationally); and inspector (10,000 jobs in southeast Michigan, 600,000 nationally). (*Id.* at Page ID # 88-89). An additional restriction limiting exposure to fumes, odors, gases, and respiratory irritants would not change the VE's answers. (*Id.*).

If someone with the above limitations was also limited to sedentary work, available jobs would include sorter (1,500 jobs in southeast Michigan, 120,000 nationally) and bench assembler (3,000 jobs in southeast Michigan, 240,000 nationally). (*Id.*). But someone who had to was unable to stay on task for 20 percent of the day would be precluded from competitive work entirely. (*Id.* at Page ID # 90). And a person could miss one to two days of work per month, but no more than 15 days in a year. (*Id.*). To close, the VE affirmed that her testimony was consistent with the Dictionary of Occupational Titles and the Selected Characteristics of Occupations. (*Id.* at Page ID # 89-90).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,

18

supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. [1] The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §

---

[1] As Plaintiff's claim was filed before March 27, 2017, she continues to receive the benefit of the "treating source rule" found in § 404.1527. For claims filed on or after that date, the rules in § 404.1520c apply instead. 20 C.F.R. § 404.1527.

404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir.

2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242.

For example, an ALJ may properly reject a treating source opinion if it lacks

supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp.

637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th

Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays

the groundwork for this, stating, "An individual shall not be considered to be under a

disability unless he [or she] furnishes such medical and other evidence of the existence

thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S.

at 146 n.5. The RFC "is the most he [or she] can still do despite his limitations," and is

measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

In accordance with SSR 16-3p, an ALJ must analyze the consistency of the

claimant's statements with the other record evidence, considering her testimony about pain

or other symptoms with the rest of the relevant evidence in the record and factors outlined

in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis

and the conclusions drawn from it—formerly termed a credibility determination[2]—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

### G. Analysis

Plaintiff argues the ALJ erred by: (1) giving limited weight to the opinions of two treating physicians; (2) failing to properly assess Plaintiff's complaints of pain; and (3) finding Plaintiff capable of some light work despite her pain and ambulation issues.

### 1. Treating Source Rule

To begin, Plaintiff disdains the ALJ's finding that the opinions of two of her treating physicians, Dr. Clary and Dr. Brazzle, merited little weight. (R. 11 at Page ID # 1094-1098). As explained above, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544.

---

[2] **Error! Main Document Only.**Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g., Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

Dr. Clary completed a medical assessment of Plaintiff's ability to do work-related activities in May 2016. (*Id.* at Page ID # 1067-1070). She had been treating Patient at quarterly appointments since 1995.[3] (*Id.*). Plaintiff's symptoms included chronic neck/back pain, headaches, pain radiating into her legs, and difficulty sleeping. (*Id.*). Standing and prolonged sitting or walking aggravated her pain; she had trouble maintaining any position for an extended period of time. (*Id.*). Dr. Clary estimated that Plaintiff could stand or walk for 20 minutes at a time but no more than an hour in an 8-hour day, and sit for an hour and a half at a time, up to 4 or 5 hours in an 8-hour day. (*Id.* at Page ID # 1068). Asked what medical findings supported these limitations. Dr. Clary responded: "pt [patient] report." (*Id.*).

Additionally, Plaintiff could lift or carry 10 pounds occasionally and 5 pounds frequently. (*Id.* at Page ID # 1067). Plaintiff would need to take about three unscheduled 30-minute breaks throughout the day and to rest for a total of 3 to 4 hours in an 8-hour day. (*Id.* at Page ID # 1068). Her impairments were likely to produce some good days and some bad days, necessitating more than four absences per month. (*Id.*). Further, Plaintiff could only occasionally turn her head or hold her head in a static position, rarely look up or down or climb stairs, and never twist, stoop, squat, or climb ladders. (*Id.* at Page ID # 1068). Her pain or other symptoms were "constantly" severe enough to interfere with her attention and concentration, prohibitive of even simple work tasks. (*Id.*).

---

[3] On another questionnaire completed on the same date, however, Dr. Clary stated she had been treating Plaintiff for 5 years—in other words, since 2011. (*Id.* at Page ID # 1071-1072).

In a second questionnaire dated the same day, Dr. Clary diagnosed Plaintiff with "cervical, lumbar disc disease" and stated her clinical findings were supported by MRIs, surgeries, and specialist evaluations, as well as Plaintiff's "chronic symptoms and frequent exacerbation." (*Id.* at Page ID # 1071). She was to "avoid prolonged sitting/standing" and bending or lifting. (*Id.*). For treatment, she saw "pain doctors," received injections, and took pain medication. (*Id.* at Page ID # 1072).

The ALJ explained that Dr. Clary's opinions merited little weight for several reasons. First, as to Plaintiff's limitations in standing, walking or sitting, the ALJ noted that Dr. Clary had indicated they were based on Plaintiff's subjective complaints, (*id.* at Page ID # 60)—in several places, when asked what medical findings supported her opinion, Dr. Clary wrote only "pt [patient] report," (*id.* at Page ID # 1068). An ALJ need not linger over a medical opinion that is based only on the patient's subjective complaints. *See Mitchell v. Comm'r of Soc. Sec.*, 330 F. App'x 563 (6th Cir. 2009) ("A doctor's report that merely repeats the patient's assertions is not credible, objective medical evidence and is not entitled to the protections of the good reasons rule.") (citing *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007)); *Bell v. Barnhart*, 158 F. App'x 277, 285 (6th Cir. 2005) (finding that a physician's opinion based on a patient's self-reported symptoms alone is not sufficiently well-supported to deserve controlling weight).

Second, the ALJ explained, Dr. Clary's "own treatment records . . . reflect minimal abnormalities at best since the amended alleged onset date," including "no evidence of gait abnormalities, reduced muscle/motor strength in any extremity/muscle group, no sensation

23

deficits, and no range of motion deficits."[4] (R. 7 at Page ID # 60) (citing *id.* at Page ID # 588-717, 892-985). When an ALJ weighs a treating physician's opinion, its consistency with other evidence in the case record is a relevant consideration. *See* 20 C.F.R. §§ 404.1527(c)(2), (4). The opinion is only entitled to controlling weight, after all, if it is not "inconsistent with the other substantial evidence in [the] case record." *Id.* at § 404.1527(c)(2). Further, the more consistent a medical opinion is with the record, the more weight it will generally receive. *Id.* at § 404.1527(c)(4).

There may be room for debate about whether it is entirely fair to characterize Dr. Clary's medical records as a whole as reflecting "[m]inimal abnormalities at best," as Plaintiff did at various times report pain in her leg, neck, back, and joints, (R. 7 at Page ID # 646, 658, 895, 935, 895, 935); easy bruising, (*id.* at Page ID # 903); numbness in an extremity (*id.* at Page ID # 895, 926); gastrointestinal symptoms (*id.* at Page ID # 926); and anxiety (*id.* at Page ID # 926, 935). Dr. Clary also noted heart murmurs (*id.* at Page ID # 648, 658, 926); tremors (*id.* at Page ID # 648); and varicosities in her extremities, (*id.* at Page ID # 926). Indisputable, however, is that Dr. Clary's records lack the evidence that the ALJ described, and that is a satisfactory basis for doubts regarding Dr. Clary's opinion.

---

[4] In support of this point, both the ALJ and Defendant cite a rather large swath of record evidence, much of which either was documented prior to the alleged onset date or is not from Dr. Clary's own treatment records. *E.g.*, (R. 7 at Page ID # 592-643) (records from Dr. Clary made prior to Plaintiff's amended alleged onset date of August 7, 2013); (*id.* at Page ID # 687) (record from Michigan Orthopaedic Institute addressed to Dr. Clary). Regardless, the ALJ is correct that the records from Dr. Clary made after August 7, 2013, do not include any evidence of gait abnormalities, reduced motor strength, and so on. (*Id.* at Page ID # 644-668, 893-959, 1064-1066).

Third, the ALJ reasoned that limitations as severe as those Dr. Clary suggested were inconsistent with the improvement in Plaintiff's neck and back pain following her 2015 surgeries (discussed in further detail below), the lack of surgical intervention for her vascular conditions, (*id.* at Page ID # 562-563, 573), her continued smoking despite her COPD/asthma and vascular conditions, (*id.* at Page ID # 81-82, 569, 898, 948, 954, 962, 1050, 1066), her sufficiently managed cardiac conditions, (*id.* at Page ID # 1059), and her controlled hypertension, (*id.* at Page ID # 923, 1050, 1059). (*Id.* at Page ID # 60). I suggest these three reasons sufficiently support the ALJ's decision to give little weight to Dr. Clary's opinion.

Of course, Plaintiff wishes to focus on more favorable facts. She points out that Dr. Clary has treated Plaintiff for at least five years, and that Dr. Clary stated her diagnoses were supported by MRIs, surgeries, and specialist evaluations. (R. 11 at Page ID # 1095) (citing R. 7 at Page ID # 1071). She notes that Drs. Brazzle and Khalil also made record of Plaintiff's chronic pain. (*Id.*). And Plaintiff has sought a variety of treatments, including physical therapy, massage, facet injections, and medication—none of which, she says, have alleviated her pain. (*Id.*). All this may be true, but so long the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted). For the reasons described previously, I suggest substantial evidence supports the Commissioner's decision to afford little weight to Dr. Clary's opinion.

25

I turn next to the ALJ's treatment of Dr. Brazzle, a psychiatrist, who filled out two medical questionnaires in mid-2016. She completed the first questionnaire in June 2016, at which time she had been treating Plaintiff for about two years.[5] (R. 7 at Page ID # 1043-1044). She described Plaintiff as "unable to function" and with "severe impairment in basic functioning," such that she "must rely on her husband for tasks like shopping, buy[ing] groceries, cooking meals, [and] cleaning the home." (*Id.*). Additionally, she had functional limitations "walking any distance" and a "disruptive sleep cycle which contributes to difficulties in the mornings and throughout the day." (*Id.*). For treatment, Dr. Brazzle had prescribed cognitive behavioral therapy and psychopharmacotherapy. (*Id.* at Page ID # 1044). She anticipated exploring different pharmacological regimen in the future. (*Id.*). The prognosis was guarded. (*Id.*). At bottom, Dr. Brazzle concluded that Plaintiff was not capable of performing "any full or part-time employment." (*Id.*).

A couple weeks later, Dr. Brazzle completed another questionnaire, in which she noted Plaintiff had recurrent major depression, treated with 100mg Seroquel daily, as well as other "health challenges." (*Id.* at Page ID # 1046). Clinical findings comprised depressed mood, low motivation, poor concentration, low energy level, and anhedonia.  (*Id.*). Her prognosis remained "guarded." (*Id.*). Further, Dr. Brazzle reported that Plaintiff was seriously limited in her ability to maintain attention for two hours, maintain regular

---

[5] It appears a page may be missing from Dr. Brazzle's questionnaire—although the document begins with question number 1, when asked to state the diagnosis and severity of Plaintiff's medical condition and supporting clinical findings, Dr. Brazzle wrote only: "see previous page." (Page ID # 1043). The previous page in the record is merely a cover sheet from Plaintiff's attorney to the ALJ, and does not provide the requested information. (Page ID # 1042). Her second questionnaire, however, does.

attendance and be punctual, ask simple questions or request assistance, and get along with co-workers or peers; and unable to meet competitive standards in her ability to understand, remember, and carry out short and simple instructions, work in coordination with or proximity to others without being unduly distracted, accept instructions and respond appropriately to criticism from supervisors, or be aware of normal hazards and take appropriate precautions. (*Id.*). She had "no useful ability to function" when it came to her ability to remember work-like procedures, sustain an ordinary routine without special supervision, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in a routine work setting, or deal with normal work stress. (*Id.*). She did, however, have an "unlimited or very good" ability to interact appropriately with the general public. (*Id.*).

Dr. Brazzle further explained that over the years, Plaintiff had become more depressed and withdrawn and less social. (*Id.* at Page ID # 1048). She was "unable to meet her basic needs"—did not consistently shower or bathe, clean her home, cook, vacuum, sweep, do laundry, and so on. (*Id.*). Additionally, Plaintiff had "memory challenges." (*Id.*).

Dr. Brazzle also penned a letter in October 2015 describing Plaintiff's how Plaintiff's "overall level of functioning" has been affected by her combined physical and mental illnesses. (*Id.* at Page ID # 867).

The ALJ gave these opinions little weight, explaining that the "minimal mental status exam findings" throughout Plaintiff's treatment with Dr. Brazzle and her

consultation with Dr. Gventer "are inconsistent with such severe limitations as opined by Dr. Brazzle." (*Id.* at Page ID # 60-61).   Mental   examinations   through   June   2016 reflected some occasions of mood/affect abnormalities, (*id.* at Page ID # 878 ("blunted" affect)), but also consistently described Plaintiff as alert and oriented times three, (*id.* at Page ID # 872, 873, 876, 878, 879, 882, 884, 885, 886, 888, 1028, 1029, 1031, 1032, 1033, 1036), with satisfactory hygiene/grooming or appropriately attired, (*id.* at Page ID # 871, 877, 879, 887, 888, 1033), and no significant speech abnormalities, suicidal/homicidal ideations, abnormalities with Plaintiff's thought process (except one occasion on which it was circumstantial, (*id.* at Page ID # 876))[6], overt thought disorder, hallucinations, or delusions, (*id.* at Page ID # 873, 876, 877, 878, 879, 882, 884, 885, 886, 887, 888, 1032, 1033, 1036). Dr. Brazzle also noted Plaintiff had "limited insight" on two occasions. (*Id.* at Page ID # 882, 884).

Additionally, the ALJ noted that records from Plaintiff's initial psychiatric evaluation in June 2014 "appear to reflect no noted abnormalities during mental status exam, but for limited insight," (R. 7 at Page ID # 58, 60)—a description Plaintiff disdains as "patently false in light of the summarized records," (R. 11 at Page ID # 1097). But the ALJ is correct. The mental status examination at Plaintiff's initial appointment indicates that her attire and grooming were appropriate, her posture unremarkable, her gait normal, stream of thought spontaneous, and progression of thoughts normal. (R. 7 at Page ID #

---

[6] The ALJ stated that Dr. Brazzle described Plaintiff's thought process as circumstantial on *two* occasions, (R. 7 at Page ID # 61), but as Defendant points out, the record for Plaintiff's November 4, 2015, appointment repeats. (*Id.* at Page ID # 876, 1036).

871). She evinced no suicidal or homicidal thoughts or plans. (*Id.*). Her language was normal and she appeared alert, though with "limited" insight. (*Id.* at 871-872). Far from "patently false," this record was exactly as the ALJ described.

Alternatively, Plaintiff argues that the ALJ should not have relied on Dr. Brazzle's notes from that initial appointment because "this record is a typed 'check list' type form that has no written doctor's notes and, as such, gives no insight." (R. 11 at Page ID # 1097). A physician's opinion posed as only a checkbox form tends to be "weak evidence," *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474-75 (6th Cir. 2016) (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)), but that does not mean the ALJ is entirely barred from considering checkbox forms. And much as Plaintiff may wish the ALJ had given less weight to these particular records, the Court cannot help her. "Arguments which in actuality require 'reweigh[ing] record evidence' beseech district courts to perform a forbidden ritual." *Albanna v. Comm'r of Soc. Sec.*, No 15-14264, 2016 WL 7238925, at *1, *12 (E.D. Mich. Nov. 22, 2016) (quoting *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014)).

Plaintiff has one final jab: "The ALJ's decision does not reflect an analysis of the regulatory factors or an indication of the weight he actually accorded to Dr. Brazzle's assessment." (R. 11 at Page ID # 1097). But she again swings wide of her mark. ALJs use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion,

consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). Here, the ALJ noted Dr. Brazzle is a psychiatrist. (R. 7 at Page ID # 56). Further, she observed that Plaintiff had her initial psychiatric evaluation with Dr. Brazzle in June 2014, Dr. Brazzle prescribed her psychotropic medication, and the record contains routine follow-ups spanning the next two years, through June 2016. (R. 7 at Page ID # 56, 60). And the ALJ discussed the consistency of Dr. Brazzle's opinions with her own treatment records, as well as those of Dr. Gventer. (*Id.* at Page ID # 56-60). Thus, the ALJ did in fact discuss the regulatory factors, just as the ALJ explicitly stated that Dr. Brazzle's opinions were given "little weight." (R. 7 at Page ID # 60, 61). In sum, for all the above reasons, I suggest the ALJ did not err in affording little weight to Dr. Clary's and Dr. Brazzle's opinions.

### 2. Plaintiff's Complaints of Pain

Next, Plaintiff contends that the ALJ failed to properly assess her complaints of pain. An ALJ must consider the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, *see Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987), and generally cannot be disturbed absent a "compelling reason," *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating

subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

     (i)    [D]aily activities;
     (ii)   The location, duration, frequency, and intensity of . . . pain;
     (iii)  Precipitating and aggravating factors;
     (iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
     (v)   Treatment, other than medication, . . . received for relief of . . . pain;
     (vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th

Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 7 at Page ID # 53). The ALJ explained that "additional limitations . . . are not warranted as the overall record is not consistent with disabling physical or mental symptoms," and proceeded to lay out exactly how. (*Id.* at Page ID # 57-58). For example, as to Plaintiff's neck and back impairments, she had at least some improvement after surgery, as discussed in further detail below. As for her COPD and asthma, spirometry testing in October 2015 reflected only mild restriction, (R. 7 at Page ID # 911), and the record contains no evidence of emergency room visits or admissions for any exacerbations[7] since the amended alleged onset date. (R. 7 at Page ID # 58) (referring to, *e.g.*, R. 7 at Page ID # 1029, 1054). Plaintiff's vascular conditions have not required surgical intervention. (R. 7 at Page ID # 366, 573). Plaintiff has been able to work in the past despite having had headaches almost her whole life, and the ALJ found "no persuasive evidence in the record to show a significant deterioration of this condition since the amended alleged onset date." (R. 7 at Page ID # 58). Nor does Plaintiff point to any now.

At Plaintiff's most recent visit, in April 2016, her cardiologist described her

---

[7] Plaintiff did visit her primary care provider, Dr. Clary, with cold symptoms and acute exacerbation of her COPD in May 2016, of which the ALJ made note elsewhere. (R. 7 at Page ID # 55) (referring to *id.* at Page ID # 948).

cardiomyopathy as "in check" with medication. (R. 7 at Page ID # 1059). There was no evidence of volume overload with regard to her congestive heart failure. (*Id.*). Her blood pressure was "well controlled" on medication. (*Id.*). And Plaintiff was directed to simply continue her current treatment for her atherosclerotic heart disease, with "[n]o need for any invasive therapy, including cardiac catheterization," and no clinical evidence of angina. (*Id.*).

Additionally, Plaintiff continued to smoke, (*id.* at Page ID # 81-82), despite repeated warnings that she needed to quit, *e.g.*, (*id.* at Page ID # 569, 595, 621, 636, 862, 884, 898, 911, 948, 962, 1050). She was also counseled repeatedly about her cocaine use and its effects on her health conditions. (*Id.* at Page ID # 366 ("Clearly explained to pt the risk of acute MI with continued cocaine use. She refused in-pt treatment."); 430; 875; 1055 ("The patient was strongly counselled against any recreational drug use, including cocaine. Risks of using any recreational drugs, to include death and cardiac arrest, were discussed with the patient in great detail.")). And she was offered substance abuse treatment, (*id.* at Page ID # 875), but does not appear to have pursued it since her amended alleged onset date. Plaintiff admitted to cocaine use in September 2015, (*id.* at Page ID # 966), and again in December 2015, when she was hospitalized for a seizure or cardiac arrest, (*id.* at Page ID # 923, 1029, 1054-1055). In March or April 2016, she admitted smoking cocaine "prior to last appointment following her seizure." (*Id.* at Page ID # 1032). The ALJ explains: "If the claimant's symptoms were so severe as to result in a complete inability to work, one would expect more aggressive attempts made by the claimant to fully adhere to her doctors' multiple recommendations to cease her tobacco and polysubstance use." (*Id.* at Page ID #

33

59).

Plaintiff takes issue, specifically, with the ALJ's statement that she has "had improvement of her symptoms" by reciting a litany of troubles apparently to the contrary: Plaintiff has had "a stroke, 2 separate surgeries, has sought pain management care, and is currently on a regimen of 12 medications (including powerful narcotics)." (R. 11 at Page ID # 1099).

But Plaintiff rather misses the point. First, she has divorced the ALJ's quote about improved symptoms from its context; the ALJ specifically said, "In particular, with regard to the claimant's *back and neck impairments*, it appears that she had improvement of her symptoms with surgery." (R. 7 at Page ID # 57) (emphasis added). And she can hardly accuse the ALJ of "fail[ing] to explain how the Plaintiff has improved," (R. 11 at Page ID # 1099), when the entire following paragraph is devoted to exactly that. The ALJ explains that a month after Plaintiff's March 2015 lumbar spine surgery, the incision had healed, Plaintiff reported she was doing well, and her lower extremity radiculopathy and weakness had resolved. (R. 7 at Page ID # 57) (citing *id.* at Page ID # 841). A lumbar spine x-ray showed "instrumentation in good position." (*Id.*). And her bilateral lower extremities exhibited 5/5 strength in all major muscle groups. (*Id.*). She had "some hip discomfort," but no back pain. (*Id.* at Page ID # 841).

Then about six months after her November 2015 cervical spine surgery, Plaintiff was "doing good" and had only "some off and on neck and back pain," which she reported was helped by "nutraceuticals" and essential oils. (*Id.* at Page ID # 57) (citing *id.* at Page ID # 962). Again, the incision was well-healed and x-rays revealed good positioning, and

34

she had good strength in all major muscle groups in her upper and lower extremities. (*Id.*). Further, since Plaintiff's surgeries, her examinations with Dr. Clary, Dr. Khalil, Dr. McKenzie, her cardiologist, and her GI specialist have noted only minimal abnormalities: no gait abnormalities, reduced muscle strength, or sensation deficits, and tenderness on only one occasion and a limited range of motion on only one occasion. (*Id.*).

Still, the ALJ acknowledged Plaintiff had continuing pain, even post-surgeries, and accounted for it in her RFC. The ALJ explained that the RFC limited Plaintiff to simple and unskilled work to account for the effects of her physical pain on her ability to concentrate or focus, as well as the effects of her headaches or medications. (R. 7 at Page ID # 52). Further, the RFC restricts her from commercial driving and foot controls to account for her lumbar radiculopathy and reported lower extremity pain and numbness. (*Id.*). The overall reduction in exertional and postural activity was meant in part to account for "any exacerbation of back/lower extremity related pain it may cause when performing more heavy or strenuous work activity." (*Id.*). Additionally, she was limited to only occasional stooping, kneeling, crouching, crawling, and use of ramps or stairs, and she could never use ladders, scaffolds, or ropes. (*Id.*).

Plaintiff is also dissatisfied with the ALJ's "explanation of how Plaintiff's daily activities undermined her assertion of disabling pain." (R. 11 at Page ID # 1099). This is partly, again, Plaintiff shadowboxing; though the ALJ provided many reasons for questioning whether Plaintiff's impairments were disabling, her daily activities were not among them. (R. 7 at Page ID # 57-59). And even if the ALJ *had* found her daily activities undermined her allegations, Plaintiff recognizes that her daily activities are a perfectly

appropriate consideration in the disability analysis. *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).

Rather, Plaintiff apparently takes issue solely with the ALJ's omission of "important limiting facts" when describing her daily activities during the step two "paragraph B" discussion—for example, that Plaintiff needs to put a chair in front of the stove and sit while cooking, that she cannot hold her arms up to style her hair, and that she has hired help with cleaning because she cannot keep up with household chores. (R. 11 at Page ID # 1099-1100). According to Plaintiff, "[b]ased on these daily activities," sans limiting facts, the ALJ concluded that Plaintiff is able to perform the physical demands of light level work, including the ability to occasionally lift 20 lbs. and stand/walk for 6 hours a day." (*Id.* at Page ID # 1100) (citing R. 7 at Page ID # 50). But the ALJ was actually discussing Plaintiff's activities of daily living in the context of her *mental* limitations, not her physical limitations. (R. 7 at Page ID # 50). Thus, Plaintiff's functional limitations due to her *physical* impairments were not particularly relevant.

In sum, I suggest the ALJ adequately discussed the factors in 20 C.F.R. § 404.1529(c)(3) and that substantial evidence supports the ALJ's evaluation of Plaintiff's complaints of pain.

### 3.  Plaintiff's RFC and Ambulation Issues

Lastly, Plaintiff presents a smorgasbord of alleged factual contradictions that purportedly render the ALJ's decision "highly suspect and inaccurate." (R. 11 at Page ID # 1100).

First, she contrasts the ALJ's statement that Plaintiff's symptoms improved after

36

surgery with evidence that she has ongoing neck and back pain, such as an April 2016 note that she "continues to require some assistance with house activities." (R. 7 at Page ID # 962). She uses this same note to push back against the ALJ's observation that Dr. Khalil's physical examination findings post-surgery revealed "minimal abnormalities," (R. 7 at Page ID # 58) (referring to *id.* at Page ID # 841, 962). But at heart, this argument is that the ALJ gave some evidence—Plaintiff's largely unremarkable physical examinations— more weight than other evidence—such as Plaintiff's own reports about her daily activities. To the extent that Plaintiff wishes the Court to reweigh the evidence, I must decline. *Albanna*, 2016 WL 7238925, at *1, *12 ("Arguments which in actuality require 'reweigh[ing] record evidence' beseech district courts to perform a forbidden ritual.") (quoting *DeLong*, 748 F.3d at 726).

Second, Plaintiff juxtaposes the ALJ's statement that there is "no evidence of gait abnormalities," (R. 11 at Page ID # 1101) (citing Tr. 929, R. 7 at Page ID # 965),[8] with consultative examiner Dr. Gventer's note that Plaintiff's gait was "strained and slow." (R. 11 at Page ID # 1101) (citing Page ID # 857). The ALJ's comment, however, was specifically about a lack of gait abnormalities *only* at Plaintiff's physical examinations post-surgery with Dr. Clary, Dr. Khalil, Dr. McKenzie, her cardiologist, and her GI specialist. (R. 7 at Page ID # 57). It is true the ALJ did not specifically mention Dr. Gventer's note about Plaintiff's gait, but the ALJ did explain that little weight was given

---

[8] Though Plaintiff cites to Tr. 929 for this quote, she presumably is again referring to the quote from the ALJ's opinion on Tr. 29, (R. 7 at Page ID # 57), as no such language appears on Tr. 929, (R. 7 at Page ID # 965).

to Dr. Gventer's opinions on the effect of Plaintiff's physical impairments on her ability to work because they were "outside the scope of Dr. Gventer's expertise as a mental health specialist." (R. 7 at Page ID # 59). That determination is appropriate for the ALJ to make. And the ALJ is correct that none of the five listed physicians observed Plaintiff to have gait disturbances after one or both of her surgeries. (R. 7 at Page ID # 841, 863-864, 893-900, 901-910, 911-922, 923-930, 931-938, 939-947, 948-957, 962, 976-977, 1050-1053, 1054-1057, 1058-1061, 1064-1066).

Plaintiff does not point to any additional evidence of ambulation difficulties in her brief. She did state in one function report that she had been prescribed a walker after her surgery, but said it was "harder for me to use than not," and so she preferred to simply lean on a grocery cart. (R. 7 at Page ID # 249). And although she testified that she had walked "like a mummy" prior to surgery, she did not mention currently needing a walker or other assistive device in her administrative hearing testimony. (*Id.* at Page ID # 77). I therefore suggest that substantial evidence supports the lack of further limitations in Plaintiff's RFC regarding her gait.

Third, Plaintiff faults the ALJ for describing her physical exams with her primary care provider, Dr. Clary, as basically normal, when Dr. Clary also opined that Plaintiff had significant pain issues from her cervical and lumbar disc disease. (R. 11 at Page ID 1101) (citing R. 7 at Page ID # 1071). But Plaintiff is simply leaning on Dr. Clary's medical assessment, which the ALJ discussed and supportably explained why she assigned little weight, as reasoned above—in fact, partly on the basis of this inconsistency. (R. 7 at Page ID # 60).

38

Lastly, Plaintiff makes a cursory assertion that "the ALJ's RFC finding was incomplete because the ALJ erroneously ignored and failed to address the issue of self-paced work, or work not dictated by an external source." (R. 11 at Page ID # 1102). But the ALJ found Plaintiff had moderate difficulties with regard to concentration, persistence, or pace, (R. 7 at Page ID # 50), and explained that the ALJ thus limited Plaintiff to "simple unskilled work with one, two, or three step instructions," (*id.* at Page ID # 52, 57).  The ALJ also included this limitation in the hypotheticals posed at the administrative hearing. (*Id.* at Page ID # 88-90). Not only did the ALJ acknowledge and account for Plaintiff's difficulties with concentration, persistence, or pace, but Plaintiff does not explain what evidence would support the need for greater restrictions. I suspect she may be referring to Dr. Brazzle's indication that Plaintiff had "no useful ability to function" in terms of her ability to "[p]erform at a consistent pace without an unreasonable number and length of rest periods," (R. 7 at Page ID # 1047)—but the ALJ discounted Dr. Brazzle's opinion for the reasons explained earlier. And the ALJ need not include limitations that he or she did not find credible. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779-80 (6th Cir. 1987). Thus, I suggest there is no cause to disturb the ALJ's finding here.

In conclusion, I suggest that the ALJ's determination was supported by substantial evidence for all the above reasons.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (R. 11), be **DENIED**, the Commissioner's Motion for Summary Judgment, (R. 13), be **GRANTED**, and this case be **AFFIRMED**.

III.   **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc. If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Date:  January 25, 2019                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date
through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 25, 2019                     By s/Kristen Castaneda
                                           Case Manager

41